Page number 19-1100 at L. Edwin Mustafa Ahmed Al Hawsawi, at L. Petitioner. Ms. Lashley, for Petitioner Al Hawsawi. Mr. Perry, for Petitioner Ben Apache. And Mr. Smith, for Respondent, United States. Let's wait until the courtroom. All right. Good morning. Good morning, Your Honor. Good morning, Your Honors. Petitioners have been litigating in pretrial proceedings in Guantanamo, their capital case, for more than seven years. And we are here today asking the court to vacate nine months of judicial decisions arising from Colonel Perella's tenure on the bench. A reasonable person looking at the time of Colonel Perella's tenure on the bench would question his impartiality. It would be really helpful to us if, when you make your argument, you do it within the standard of review that we have to apply here. This is a mandamus action. Yes, sir. So you have to have clear and indisputable right to relief. That's correct. This is not an appeal from the commission. And the facts show clearly and indisputably that a reasonable person would question Colonel Perella's impartiality if that reasonable person had knowledge of all the facts on the record. There is a clear and indisputable right to the writ because of the record that shows the issues with Colonel Perella's bias or potential bias. What do you think the strongest part of your case is? What would you point to as the strongest? Judge Hale, our claim is one that's cumulative. So I hesitate to get torn down the road of one fact as another. That's fair. You don't have to do that if you don't want to. That's a totally fair point. But of all the arguments that you accumulate, is one stronger than the other? I think our strongest, the strongest factor is that the extensive ex parte proceedings that take place in Guantanamo commissions. Colonel Perella conducted five ex parte proceedings with the prosecution. And most notably, one of the first acts in the first month he was on the bench was to request an ex parte proceeding. And I'll characterize that most specifically. He asked for the prosecution who had requested an ex parte proceeding to expand the notion of that proceeding into a history of the ex parte litigation in the case. So essentially he wanted an ex parte presentation from the prosecution. The same prosecution that he worked for just three years earlier, some of the same prosecutors that were his colleagues just three years earlier. I'm sorry. Is there evidence that he himself worked on this prosecution? The best that he was able to give on the record in voir dire was that he does not, to the best of his recollection, he didn't work on the case. And to the best of his recollection, he didn't get any, he wasn't present at any briefings. But the record also shows that counterterrorism prosecutors, of which there were only 40, and we know at least three of those while he was at the counterterrorism section were prosecutors on Petitioner's case, at least three of those, that those 40 lawyers met regularly according to the affidavit at the appendix in Petitioner Benatash's, at 468 of Petitioner Benatash's appendix. It indicates, an affidavit indicates that those 40 counterterrorism prosecutors met regularly to discuss the cases that they had. So it stands to reason that when Colonel Perella says to the best of his recollection he didn't receive a briefing, it's likely he did. But again... See, when you get to words like that, it's hard to fit this under clear and indisputable. That's what... Well, it's clear... There's no clear evidence in the record that he worked on this case. There's surmise, but that's not clear and indisputable. Correct. But, Judge, respectfully, what we need to show is not that there actually was, that he actually worked on this case, but that there's an appearance problem, and that a reasonable person looking at the record would question his ability to be impartial. The question is not whether he actually worked on the case, but whether the record shows that he appeared to be impartial. And if Your Honor is going down to looking at the road of 455B3 in the federal courts, which... That's where I was going. Is that where you were going? Yeah. Okay. Our position is, one, that 455B3 has no analog in the military commissions because that distinction between prior federal government work and being on the bench has no application in the military. Military judges are always with the federal government. So that's why in the military, and in military justice, Rule 902A, which is analogous to 455A, and says that a judge should be removed... Sorry, shall remove himself, recuse himself when his impartiality might reasonably be questioned. So that analog to 455A, which exists in the military commissions under 902A, that carries much greater weight in the military justice system, because military judges stand as the bulwark against the influence, against the power of government, because they are the only bulwark. They're not a third branch. They're part of the government, and the appearance issues and their role are therefore paramount. And the importance of a judge ensuring that the appearance of impartiality is maintained is therefore so much more important in the military commission system. So... What's your position on the order of the CMCR that came down in May? The chief issue with the CMCR's position is that they changed an imperative in 902A to a conditional, and they say the judge should remove himself under 902A if there's an appearance. And that is not the standard in military justice, so they incorrectly stated the standard. It clearly says in 902A, a military judge shall recuse himself if his impartiality might reasonably be questioned. So the CMCR essentially misstated the rule that applies in military justice and underestimates the importance of the judge having to serve as that bulwark in the system. In Hassan v. United States, which we cite in our papers, the Court of Appeals of the Armed Forces was clear that in the military justice system, the impartiality of a judge in fact and in appearance is paramount to preservation of the system. And this is where things failed. Colonel Perella, in his tenure at the counterterrorism section, worked with prosecutors on this case. He was a full-fledged prosecutor just three years before he took the bench in this case. And it's important to note, going back to the – if you want to – He worked with prosecutors on this case. You're just saying he worked with people who were prosecutors, not that he worked on this case. Correct. He worked with prosecutors. He was colleagues, if you will, Judge. But the importance there is to look at not – this is not – CTS is not just a federal agency. It's not as though he worked at DOJ and the Securities Litigation Division. He was with the section in the division that is dedicated to prosecuting counterterrorism cases such as petitioners. The section – About 40 lawyers in that? That's what the record shows, yes, that there were approximately 40 lawyers. So it's, in fact, much more analogous to the private firm situation. And, again, I don't want to be dragged down the road of paralleling too much with the federal practice because this is a military practice. And the military practice has that rule in 902A that I cited to you, but also it adopts – excuse me – Colonel Perella was bound by the canons of judicial conduct. But isn't the right analogy U.S. attorney's offices? There are lots of federal judges who come from U.S. attorney's offices and preside over cases brought by that office. The only limitation is they can't preside over a case they worked on. Why isn't this exactly the same thing? Because this is not – because he was coming from an office that was designated to prosecute this case, essentially. The counterterrorism section – Well, the U.S. attorney – assistant U.S. attorney could come from an office from a section that's, say, designated, organized to bring gun cases. And that now-confirmed judge could sit on gun cases from that office so long as it wasn't a case he or she worked on. But that judge – I see my time has run out. You can keep going. Thank you. That judge joins the third branch, as you know. And that judge becomes independent and is no longer – and will no longer, theoretically, return to the executive branch. That is not the case with Colonel Perella, who was sent to the bench, assigned to the bench, not appointed, assigned to the bench by the executive, returns to work for the executive, and came from the very section whose sole mission was to prosecute – is to prosecute the petitioners. And – like, the petitioners. My time has run out, so I'll leave it to my colleague to take care of it. Good morning, Your Honors. May it please the Court. Following up on my colleague, it's – the relevant factors under Liljeburg that would cause a reasonable person to question the impartiality or perceive the appearance of partiality of Colonel Perella are not just that it's 40 attorneys in the counterterrorism section, but that the counterterrorism section was created in the wake of 9-11, the very case in which, obviously, the petitioners are being accused of committing. And there – CTS is divided into three groups, an al-Qaeda section, a non-al-Qaeda section, and a domestic section. The undisputed record is that work in these sections bleeds. You can be assigned to a particular section, but that doesn't mean that's exclusively what you do. And you certainly sit in on unit meetings, office-wide briefings. Memoranda are distributed throughout the office to everybody. And Mike Mullaney, the chief of counterterrorism section himself, wrote a letter to the Marine Corps after Colonel Perella's time working at CTS, saying that's exactly what Colonel Perella did. He wrote memoranda that was on topics of importance to the CTS that were widely read and distributed to CTS attorneys. There is not another case more important to CTS than the 9-11 case. So, again, is it established clearly and indisputably that he worked directly on the case? No, Your Honor. But it is clear and indisputable that he worked in an office alongside attorneys that were prosecuting the case and would have been participating in meetings and memoranda talking about the case. And that's what rises to the level of the appearance partiality. But does your case depend upon the presiding judge having heard in his recollection? The presiding judge heard in his recollection? Having heard in his recollection of what he did and did not encounter? Well, I think one of the relevant factors is that when presented with the questioning of the petitioners during Vore Dyer on September 10th, that was the best answer that he could give was, to the best of my knowledge, I did not work on the 9-11 case. That answer changes over time as, of course, it becomes abundantly clear that CTS is a big problem. In his rulings denying the motions to disqualify, it's suddenly I did not work directly on the 9-11 case is his answer, which is true. He was not detailed, much like other CTS attorneys like Jeffrey Goharing and Clay Trevett in our record, are detailed from CTS to the Office of the Chief Prosecutor to work on the 9-11 case. He was not that. on behalf of the United States in Guantanamo. But that is not what's necessary to establish an appearance of partiality, as counsel earlier said. But if it's true that he doesn't recall, then there's nothing to balance. Well. That would be apparent to any reasonable person, right? It's whatever the reasonable person knowing all the relevant facts. So one of the relevant facts would be that his answer during Lord Dyer was that he did not recall working on the 9-11 case. But what the reasonable person would also know is that CTS is a very small office. His own section boss said that he could have possibly sat in on 9-11 in military commission meetings where those cases were discussed. That was Anthony Asuncion, was his section chief, his immediate supervisor. The Marine Corps. Suppose he did. Suppose there was some instance in which he did, but he doesn't recall it. How can you bias him? Because it doesn't. The end of the inquiry is not whether the individual can admit bias or admit that there's an appearance problem. It's that given, and many times Military Judge Perella said, irrespective of my time at CTS, irrespective of my relationship with Jeffrey Goharing, one of the CTS attorneys, I can be impartial in this case. It's an objective test where looking at all the factors, even a judge would have to say there's an appearance problem. Typically that involves somebody who does have knowledge and says I can put that aside. Here we have someone who says I have no knowledge or at least no recollection. So there's nothing to put aside. Military Judge Perella could have hit his head and experienced amnesia and forgot about the entire time he was at CTS from July 2014 to June 2015. And it would not change the clear and indisputable record in this case based on the appearance of partiality. Because of his time at CTS working directly alongside prosecutors that are prosecuting this capital case, there's an appearance problem. Also, one of the big factors that a reasonable person would have to take into consideration is in December of 2014, the Senate Select Committee on Intelligence issued its report on the Interrogation and Detention Program, commonly known as the Torture Report. A copy, there was only so many copies given to government agencies. The Senate gave a copy to DOJ and of course the CTS attorneys, because that is their mission to prosecute the 9-11 case, would have had access to that report and discussed it in December of 2014. That's exactly when Colonel Perella was there. You just said the mission of the CTS attorneys was to prosecute the 9-11 case. That was true of the CTS attorneys in that section, correct? It is specifically true of the individuals that are detailed to the Office of the Chief Prosecutor who wants to prosecute the case. But CTS office-wide, as shown in the undisputed record based on interviews of Mike Mullaney, the chief of CTS, and Anthony Ascension, said that work was fluid between the sections. Just because you were assigned to the Al-Qaeda section or the non-Al-Qaeda section or the domestic section doesn't mean you didn't participate in meetings involving Al-Qaeda and involving the 9-11 case. As I hear your argument and your colleague's argument, it depends very heavily on us accepting your argument that Lydicke, is that how you pronounce it? Lydicke? Lydicke, whatever it is, doesn't govern 902A and B, right? Well, I would agree that Lydicke is a specific situation of 455A. And as counsel for Mr. Ellis, I pointed out, we're in a completely different situation in the military system. I understand your argument, but let's assume that we didn't agree with that. Let's assume that we think we're bound by the Supreme Court's, that the Supreme Court's interpretation of 455 applies here as well. Okay? And that the only basis on which a former government lawyer's impartiality can be reasonably questioned, that's this case, 902A. Are those instances covered by B, then would you concede then that you can't, it says, the military judge has acted as counsel, which is not true here, or in the same case generally. In other words, neither of those would cover your argument that he was on the staff of the office that was bringing in 9-11 cases. The only concession, and I wouldn't call it a concession necessarily, is the undisputed record is that he was not detailed to the 9-11 case from CTS. Okay, but there's no evidence in the record at all that he worked on this case. Well, we don't know that for a fact yet. Remember, my question is all in the context of us not accepting your argument that 902A and B are different. I mean, different from 455. That is, we're bound by what the Supreme Court said. If we are, then it seems to me for you to have, be able to show clearly and indisputably a right to relief, there's got to be strong evidence that, convincing evidence that the judge here worked on this case, acted as counsel to any offense charged, or in the same case. Right. Right? The Petitioner attempted to get to the bottom of this. That's why I started out by saying it seems to me your whole case turns on us accepting your argument that Letickie doesn't cover it. Right. Because I can't get to the appearance of propriety standard in A beyond what B says. Correct? I would not agree with that, Your Honor. That's what Letickie says. Letickie's situation did not involve extrajudicial determination under 455A. It was exclusively a determination of a judge who had made comments during the trial proceedings. Well, I know the facts are different. You're totally right. The facts of the case are different. But Letickie, that stands for the proposition that when 902B is in play, there's nothing in 902A that goes beyond that in terms of the appearance of impropriety. Right. That's what it holds. Sure. And I think what Your Honor also needs to consider is the Supreme Court has said also in Baker v. Hostetler that there are extraordinary situations where a prior government service can be considered under 455A. And that's cited in our petitions as well. And what is the extraordinary circumstance? The extraordinary circumstance in this, Your Honor, is that this court has not yet had a situation to resolve an appearance of partiality situation involving a prior government attorney such as Colonel Perella. We've had, obviously, Judge Silliman and Ray Muhammad who had to, Your Honors, had to resolve a situation where it was comments he made while as a law professor that would go to the guilt or innocence of the defendants. I mean, that was pretty clear and indisputable. I wrote that. Right. That was clear and indisputable. And so was Alan Sherry. Those were clear and indisputable. But I guess what I'm struggling with is to try to get you to tell me what in this case makes, what in the circumstance of this case makes this case like either of those. The similarity is that there's a clear and indisputable right to an unpious, impartial judge. Right. But there has to be some evidence, clear and indisputable evidence that that's not this case. The clear and indisputable evidence is that a reasonable person would perceive the appearance of partiality. But if Your Honors, the question really dives into the sufficiency of the record before this court. The reason why we don't know specifically exactly what Colonel Perella did at CTS is not because the petitioners didn't try to discern that. It's because the government, the military Judge Perella, and to some extent the Court of Military Commission Review, didn't take this matter seriously and did not err on the side of more transparency and accountability. The government denied the discovery that would have shown exactly what Colonel Perella did at CTS. The military Judge Perella, the target obviously of the disqualification motion, denied the motions to compel to get that information. In fact, Judge Perella, in his ruling denying the motion to compel discovery, said as far as he could tell, there is no right to any discovery at all on a disqualification motion. Which cannot certainly be the case because of the nature of this proceeding, the need for heightened due process and reliability of its findings because it's a capital case. And because the rule for military commission, like the federal rules, provides for discovery that is material to the preparation of the case. There is nothing more material to the preparation of a motion that disqualified based on his work at CTS than discovery regarding his time at CTS. He denied that motion, and he denied follow-up questions from the petitioners to our board of honor that would have answered those questions as well. So in every step of the process, the government and the military judge stymied the efforts to make this record a little bit more clear to the honors. But our position, of course, is that there is a clear and indisputable record about the appearance of partiality. Aren't you also arguing, besides his time in the CTS, that he had a separate friendship with the prosecutor who is, I think, was he in CTS at the same time? Yes, Your Honor. Jeffrey Goehring was a prosecutor at CTS in 2014 and 2015. And then he vetted the ex parte. And he was also a CTS prosecutor prosecuting the 9-11 case, basically from the get-go. From, I believe, 2008 onward, Jeffrey Goehring has been a prosecutor. So why don't you argue that makes it a little different? That is also, obviously, a relevant factor that would cause the reason for some question. And in particular, the way in which military judge Perella responded to questions about Jeffrey Goehring, he did not affirmatively disclose that he worked with Jeffrey Goehring at CTS. That was something that the judicial canons would have required him to do. And he admitted that he was bound by them, made applicable to him through a JAG instruction to the Navy and Marine Corps. But he didn't affirmatively disclose that. It took questions from the petitioners to ferret out that he had this personal relationship with Jeffrey Goehring, that he had run these races with him from 2007 and 2008. And they had stayed in contact. They had met in the late 90s and stayed in contact since. That is a relevant factor that goes into the equation as well, his failure to affirmatively disclose. And then when follow-up questions were attempted to be presented to him by the petitioners during war time, he shut them down. Very early, you quoted an evaluation or a memorandum to the effect that work was fluid across the three sections within CTS. Yes. But I also see Perella saying, I can only recall being detailed to cases within my section. Right. And his recollection was he worked on domestic counterterrorism cases. And we know for a fact- And they should be doing probable cause determinations. Correct. And there's one case that he worked on- It's pretty clear that had he worked at all on a 9-11 case, it would have stood out better. That's in his mind, don't you think? He's doing domestic cases only. Well, that's what he recalls specifically working on. But again, that's not the end of the inquiry. And because of all the other information that has been induced into this record, it's only one part of the puzzle. And the bigger puzzle here is, or problem, that the military commission has is this public confidence problem. And if we're going to instill public confidence in this military commission system, as this court has expressed just a few months ago on the sherry, then we need to take these matters more seriously and err on the side of more transparency, more accountability, more discovery about his time at CTS than what occurred here today. And if without that, then there is a loss of public confidence in the system. And that is why this is an extraordinary case that needs remedy today in a rate of mandamus. All right. Thank you. Thank you. Mr. Smith. Thank you. Thank you, Your Honor. May it please the court. Jeffrey Smith on behalf of the United States. The petitions in this case should be denied because the petitioners cannot show a clear and indisputable right to the relief that they seek. I'd like to begin with the record before us. We provided to the court in the supplemental excerpts the entire voir dire. It was from 9 a.m. to 3 p.m. where Judge Perella answered questions from the defense counsel. And I'd just like to focus on one page, because contrary to what you've heard, Judge Perella said, and this is on page 98 of the SCR, I do recall that in 98 of the supplemental excerpts of record. I'm sorry. And Judge Perella said, I do recall that none of the cases that I was working on involved anything other than Article III courts that had no workings with the OMC, that's the Office of Military Commissions, or the 9-11 case. So he did specifically recall that he didn't work on this case or on any other commission cases or even on any other al Qaeda matters. And it's not entirely unsurprising that he didn't work on these cases and that he didn't have any professional interaction with the people who did, because the cases are being prosecuted out of an office in Virginia that is headed by a military general. The CTS attorneys who work for this general on this case go to work every day in Virginia. They don't have an office at CTS, as Judge Perella stated. They're not in the same place. Judge Perella saw Mr. Groharing only one or two times, or two or three times, one being the Marine Corps ball. One or two times at CTS, and those were at social events where he didn't discuss the substance of the case. What about the denial of discovery? So, well, as I noted, Judge Perella sat for the better part of a business day answering questions. What about the rejection of the motion for discovery? Okay, so I think there are two points here. First, the petitioners have shown no basis that there is any discoverable or relevant, set aside discoverable, relevant information that they don't already have. They even did their own investigation, and their investigation is consistent with everything that Judge Perella said and just fills in details. I guess what they're asking for are the internal memoranda he wrote, the kind of things that DOJ doesn't give out when individuals are appointed to the Supreme Court or to this court. I mean, that's the kind of very sensitive, internal, deliberative process work that the government doesn't give out, and it doesn't have any relevance here. And the second point I would point out is the petitioners have never, in their papers or in their argument today, set forth any legal right that they have to discovery in this type of thing. And if you compare it to, there's quite a few cases that we cite regarding recusal issues. None of those cases involve motions for discovery or a right to discovery. None of them set forth a right to discovery, and none of them, frankly, have anywhere near the level of disclosure of information that Judge Perella gave in this case. If you compare, for example, then-Judge Kavanaugh's disclosures in Baker and Hostetler, he gives the specific information that they're entitled to and no more. Judge Perella gave extensive background, answering the questions, again, for hours. Now, Judge Tatel asked earlier about the relationship between Section 455 and Rule 902 of the Rules of Military Commissions. The fact is, as it pertains here, the rules are exactly the same. There are certain differences between the two rules, and they stem mainly from the fact that the rules, the military rules, which are the same in court-martials as in military commissions, don't account for the possibility that a judge formerly was in private practice because military judges don't come from private practice. They're career government, they're career military officers, generally JAG officers. And so the military rules don't have 455b2, and 902b2 is essentially equivalent to, and for this case is entirely, substantively the same as 455b3. Petitioners' argument today that the military rules are somehow different, or that 455a and 902a should be interpreted differently, despite the fact that there's no, the only difference between the two sections is that the military rules are gender-inclusive, where the federal rules simply uses the masculine pronouns. This is an argument that they're making for the first time today. It's not in their papers, and they didn't make it below, and they have not elicited any support for the provision. Now, my colleague brought up Baker and Hostetler. Again, that's then-Judge Kavanaugh's opinion. What he said about the relationship of A and B in a context like this is that in order to, for prior government service to require disqualification, there must be, quote, there must be something about the prior employment itself that is different from what one would have anticipated, and there's nothing of that sort here. Judge Henderson asked about Mr. Groharing. The relationship between Mr. Groharing and Judge Perella is not a close one at all, and the characterization that they met and stayed in touch is not really accurate. In fact, while they are acquainted with each other, they met in the late 90s, both being military JAG officers in the Marines. They did not have much interaction, although they were both stationed in San Diego. Judge Perella described Mr. Groharing as, quote, just an acquaintance. Well, there was the team-building exercise. So a number of years later, in 2007, one of Judge Perella's teammates, Judge Perella needed a fourth member for his athletic team, and one of his teammates suggested Mr. Groharing. And on the basis that Mr. Groharing was, athletically speaking, the best available person, Judge Perella agreed to have Mr. Groharing on his team or invite him on the team. And they did not train together. They came together the day of the event. They competed. They did it again the next year. And then after that, they didn't speak at all for years until approximately 2014 when they happened to see each other at a social event together. And then after seeing each other at two to three social events, they didn't speak again for years until Judge Perella was appointed to this case. So there's no friendship whatsoever. And even if there were, friendship, of course, is not a basis for a judge's recusal. And I would point to there's a number of cases on this, but Judge Maida's opinion for the district court in Philip Morris explains this in some detail. And in that case, he and the attorney appearing before him were, in fact, friends. They had worked at the same law firm. The attorney had hosted Judge Maida and his wife in his home. Judge Maida and the attorney had had lunch after Judge Maida took the bench. But Judge Maida observed that that clearly did not require disqualification because it was just an ordinary friendship and not something closer. Here, what we have is something far below an ordinary friendship. Well, I think, assuming we're under 455A also and we can consider the appearance of partiality, isn't it a matter of building on things? He's in an office with 40 lawyers. That's one point. One of those lawyers happens to be the prosecutor. That's the second point. It isn't. It is the appearance, it seems to me, gets stronger the more points you have that question impartiality. Well, I would say two things. First, under 455A or Rule Section A in the military commissions, courts can consider the aggregate. The statements that you're making, I think, are not entirely accurate. He's not in the same office. I know. He's in a different state. He's in D.C. The military commissions are being prosecuted out of Virginia. I know. But there is contact in the office, as I understand it from the record. They may be in, you know, FBI agents are in different stations, but they know each other and talk with each other and work together. Well, Judge Perala stated on the record that he never attended meetings of the full CTS. The attorneys who work on the military commissions work full-time on the military commissions, and they don't have offices in CTS. So Judge Perala explained that he saw Mr. Goharing, again, two to three times during that period, one of which was the Marine Corps ball, and that he did not recall seeing the other prosecutors at all, although it's possible that he could have met someone at all. Where does it say that he never attended a meeting of the full CTS? I don't think I have that pinpoint. I'm sorry. But he did say that he attended only meetings within his section. Now, I would like to – It would help if you could give us that site. Okay. Can I get it to you later? Perhaps you could forward to the deputy at the close of the reply. Yes. Okay. Sorry. So a couple other points that I'd like to correct. The counterterrorism section was not created in the wake of 9-11. The counterterrorism section has existed for decades. The National Security Division was created, and it was created to bring the department's national security prosecutors in the same division as the department's intelligence functions, and it was part of taking down the wall to prevent a future 9-11. The National Security Division doesn't exist to prosecute 9-11. It exists to oppose terrorism in all its forms, as well as other national security violations, and to prevent future attacks like 9-11. The CTS is split up. I think it's now four groups. The groups are not al-Qaeda, domestic, et cetera. They have no – and this is actually something that Mr. Estacion told the investigator. They don't have specific subject matters. And I don't think it's true that Judge Crowley's – There isn't? There aren't three – there were not at the time three sections? I think there were three at the time, but there was not an al-Qaeda section and non-al-Qaeda section. Was there a domestic section? No. The citation that they have, their investigator talked to a paralegal who left in 2009, and I don't know how things were in 2009, but at the time Judge Perella was there, and their investigator also talked to his supervisor who said that there weren't specific sections. Of course, none of this applies to the military commission people who are not there. They're off – they're working in Virginia exclusively on the military commission cases. Can I ask you if it's in the record? I don't want you to take your time. Do we know the pool of people from whom the judges are picked? Generally, yes. The judge is chosen by the chief judge for military commissions, and that was Judge Pohl at the time. The pool that Judge Pohl chooses from – and this is in the record, but, again, I don't have the pinpoint site – it's nominees of military judges who have to have at least two years of judicial experience, and they're nominated by the TJACs, which is the head of the JAG service, the JAG organization for each of the three services. So Judge Perella was nominated by the TJAC for the Navy, and the TJAC for the Army, and the TJAC for the Air Force also nominate people. And then Judge Pohl, the chief judge who at the time was Judge Pohl, chooses among the judges. And how many judges have there been in this case? In this case, I believe just Judge Pohl, Judge Perella, and the current judge, Judge Cohen. Okay. It's a small service. Sorry? The JAG is a small service, a small unit. Yes. I mean, everyone who comes up through the training knows everyone else. Well, the Marine JAG is particularly small. Not all these judges, just to be clear, are not – Judge Cohen, for example, is an Air Force judge. So it's not only Marine judges involved. But, yes, the Marine JAG Corps is the smallest service. And, of course, Judge Perella also talked about how he knew General Baker, who was the head of the Military Commission Defense Organization, who was also a Marine JAG. Okay. And I would just conclude by noting, as we did in our brief, that there are numerous cases of prosecutors, including U.S. attorneys, leaving their office and hearing cases as district judges. Well, as Ms. Herring points out, the Article III situation is quite different because those judges don't then return to the U.S. attorney's office, right? That's true, but there's no reason to believe that Judge Perella will return to CTS or to the Department of Justice. His current – Because he hasn't ruled it out. Well, it's true. I suppose anything is possible in the future. He didn't say he would never consider it, but his current job is a non-legal job commanding military – or commanding security at embassies. So there's no reason to believe – I mean, a judge could return, I suppose, to government service. Sometimes judges do that, but it's not something that you necessarily expect in that case or in this one. But I don't think it's really a distinction. I'm sorry. Who's his employer now? He still works for the Marines. Marines still work for the Marines. Yeah, he's a colonel in the Marines. What does he do to embassies? His assignment – Embassy security. Yeah, his assignment is he's the head of worldwide embassy security. That's my understanding. He's the head of what? He's the head of security at embassies for the United States. So the Marines are responsible for security at foreign – at our embassies abroad. Is that in the record? What are you just trying to say? I don't doubt it. It's just – is it in the record? I'm sorry? Is it in the record? It's – yes, I believe it is in the record. I don't know how specific the description is. But will the record make clear that he hasn't gone back to being a prosecuting lawyer? I believe it will. Maybe you could give us that slide, too. Okay. Okay. If there are no further questions, thank you very much. And we ask that the petitions be denied. All right. Does Mr. Perry have any time left? All right, why don't you take two minutes? Just to follow up on questions from, I believe, Judge Tatel, or I believe it was Judge Ginsburg, the pool of available judges – and there's a footnote in the petition by Mr. Al-Hassawi that just in the Navy or the Marine Corps alone, there are 450-plus individuals that would have fit the regulation with two or more years of experience at that time period. So it's a very large pool, larger than you might believe. And out of all those available – that was just the Marine Corps. Then there's the Air Force-available judges, the Army-available judges, and the Navy-available judges. Even the Coast Guard could conceivably have available judges. Out of all those judges, this is the judge, a judge that had just completed a couple years prior a nine-month stint working in the counterterrorism section. That was the judge that was picked for the 9-11 case. So at the end of the day, how do we resolve these lingering questions about what exactly he did at the counterterrorism section? I think the record does establish that there was a clear and indisputable right to this discovery. And although discovery orders are generally not available for review, mandamus is an extraordinary remedy that can take the place in a discovery order situation. It's not something that was briefed or anything like that. Is it in the petition? No, it's not anything that was in the petitions. But in response to Your Honor's questions, I think there wasn't a clear abuse of discretion by Judge Perala in denying that motion to compel the discovery. And had the parties obtained information about his work at CTS? And again, the deliberative process privilege was not something the government asserted in response to that discovery request. Their response was, go ask Judge Perala during voir dire, which again takes this whole situation out of the 455 realm. In federal court, obviously you do not voir dire a federal judge to determine whether she is going to be impartial. But in the military system and in the military commission system, you do. And if, like Judge Perala, denies a motion to compel discovery that would be material to the questions of his partiality, if you're going to deny that motion to compel, you better allow a lot of questions to take the place of that discovery. And he denied those questions as well. So he has two marks. Just to follow up on Judge Ginsburg's question, did I understand you to say that you don't, in your petition here, have you challenged that decision? Can we challenge the discovery decision? I think it's a record that is fully developed before the discovery. No, no, that's not what I asked you. You didn't ask for mandamus to compel discovery. No, we did not. Okay. All right. Thank you. Thank you for your time.
judges: Henderson, Tatel, Ginsburg